UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,

               -against-

TYRONE SANTOS,

                  Defendant.
----------------------------------------------------------------x

<u>**MEMORANDUM AND ORDER**</u>

Docket No. 23-CR-436 (OEM)

**ORELIA E. MERCHANT, United States District Judge:**

Defendant Tyrone Santos ("Defendant" or "Santos") is charged in a four-count indictment for two alleged robberies of United States Postal Service ("USPS") mail carriers occurring in late 2023. Santos now moves pursuant to Fed. R. Crim. P. 12(b)(3)(C) to suppress three categories of evidence: (1) physical evidence, including a cellphone and the contents of the cellphone, (2) out-of-court identifications of the Defendant made by three individuals, and (3) statements made by Santos during police questioning. Santos also seeks to preclude from introduction at trial: (1) any non-noticed identifications by witnesses, and (2) any documents or materials obtained through the use of search warrants that the Government has yet to disclose in discovery.

For the following reasons Santos' motion is **DENIED in part** and **GRANTED in part**.

## BACKGROUND

This case arises out of two separate robberies of USPS mail carriers in Brooklyn. One robbery took place on September 30, 2023 (the "September Robbery"), and the other on October 14, 2023 (the "October Robbery"). *See generally* Affidavit and Complaint in Support of Application for Arrest Warrant ("Complaint" or "Compl."), ECF 1; Indictment, ECF 9; Affidavit of United States Postal Inspection Service ("USPIS") Inspector Demetre Vernon in Support of Premises Search Warrant dated Oct. 19, 2023 ("Premises Warrant"), ECF 25-1, ¶ 6. The Government alleges that Santos robbed two different USPS mail carriers of their post office relay

1

box key or "arrow key" while brandishing a weapon.  Compl. ¶ 5.  Arrow keys are valuable as they allow access to USPS relay boxes, "which may at times contain cash, checks, gift cards, credit cards, documents that contain personal identification information, and official forms of identification."  Government's Opposition ("Gov't Opp."), ECF 25, at 8; Compl. ¶ 3.

The investigation conducted by the USPIS and the New York Police Department ("NYPD") included interviews with the mail carriers who were robbed, one of which identified Santos in a photo array, as well as witness interviews, and a review of neighborhood security footage.  Compl. ¶¶ 10-12; Premises Warrant  ¶¶ 8-23.  As noted in the Complaint, evidence showed that the perpetrator and Santos shared generally similar physical characteristics and wearing generally similar clothes at the time of each robbery.  Compl. ¶¶ 5, 7-10.  Additionally, in both robberies, the perpetrator "surveilled young, slight-in-stature female postal carriers on their mail routes, accosted them with a weapon, demanded their arrow leys, and then fled the scene." *Id.* ¶ 5.  "Both robberies took place in a very limited geographic area, within four blocks of each other, and the perpetrator fled to the same residential building after both robberies."  *Id.*

On October 19, 2023, the Government filed the Complaint,[1] and the duty magistrate judge issued an arrest warrant as to Santos.  *See id.*  Contemporaneously, the magistrate judge also approved a search and seizure warrant for Santos' purported place of residence at 815 Sutter Avenue, Apartment 1A (the "Sutter Ave Residence") in Brooklyn, New York.  *See* Premises Warrant.  The USPIS believed that the Sutter Ave Residence was owned by Santos' sister and that he had moved into the apartment after completing federal prison sentence.  Premises Warrant ¶¶ 18-20, 22.   The United States Probation Office also "confirmed" that Santos had listed with the agency the Sutter Ave Residence as his current place of residence.  *Id.* ¶ 20.

---

[1] While the Complaint discussed both the September and October Robberies, it only sought Santos' arrest pursuant to his alleged involvement in the October Robbery.  *See generally* Compl.

On October 20, 2023, agents from the USPIS and the U.S. Marshals Service executed the Premises Warrant, arrested Santos, and searched "in particular, the areas of the home" alleged to be used by Santos.  Affidavit of USPIS Inspector Demetre Vernon in Support of Cellphone Search and Seizure Warrant dated Nov. 3, 2023 ("Cellphone Warrant"), ECF 25-2, ¶¶ 6, 23.  Among other items, agents recovered "metal pipes," which Santos asserts are actually "pieces of a Swiffer Mop," and a Motorola cellular phone found on the couch where Santos slept.  *Id.* ¶¶ 23-24; Attachment B to Cellphone Warrant; Santos' Motion for Suppression ("Santos Mot."), ECF 22, at 8, 19.  Agents also seized various items of clothing, including a sweatshirt, photographs of Santos, Santos' identifications, and mail with Santos' name on it.  Santos Mot. at 8; Gov't Rule 16 Letter dated Apr. 1, 2024, ECF 23.

Just after his arrest, Santos made certain statements during an interview with federal agents.  *See* Gov't Rule 16 Letter dated Nov. 29, 2023 ("Nov. Ltr."), ECF 12.  "This interview was recorded on video."  *Id.*  Santos was subsequently arraigned, and the grand jury returned a four-count indictment on October 31, 2023, charging Santos with not just the October 2023 robbery claimed in the arrest warrant, but also the September 2023 robbery.  *See* Indictment.[2]

On November 3, 2023, the Government secured a search warrant for the phone retrieved at Santos' apartment.  *See* Cellphone Warrant.  On January 24, 2024, the Government procured a second search warrant to expand the scope of the Cellphone Warrant based on the forensic extraction performed by law enforcement.  Santos Mot. at 4.

---

[2] The counts are: (1) a September 30, 2023 robbery of a USPS mail carrier, whose identity is known to the affiant ("Mail Carrier-1"), of her arrow key, in violation of Title 18, United States Code, Section 2114(a) (the "First Robbery"); (2) theft of a USPS arrow key, in violation of Title 18, United States Code, Section 1704, arising from the First Robbery; (3) an October 14, 2023 robbery, with a firearm, of a USPS mail carrier, whose identity is known to the affiant ("Mail Carrier-2"), of her arrow key, in violation of Title 18, United States Code, Section 2114(a) (the "Second Robbery"); and (4) theft of a USPS arrow key, in violation of Title 18, United States Code, Section 1704, arising from the Second Robbery.  *See id.*

Santos filed his motion to suppress papers on March 22, 2024.  *See* Santos Mot.  The Government filed its opposition on April 19, 2024, and Santos filed a reply on May 10, 2024.  *See* Gov't Opp.; Santos' Reply Memorandum ("Santos Reply"), ECF 26.

## DISCUSSION

### A.  Out of Court Identifications

Santos argues that four out-of-court identification procedures resulting in identification by three different individuals must be suppressed on the grounds that the identification procedures violated his due process rights.  *See* Santos Mot. at 10-13; Santos Reply, at 15.  For the reasons below, Santos' motion to suppress each individual's relevant identification is denied and the identification evidence is admissible at trial.

"Due process protects 'the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification.'"  *United States v. Diaz*, 986 F.3d 202, 206-07 (2d Cir. 2021) (quoting *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (internal quotation marks omitted)).  "'[T]he linchpin in determining the admissibility of identification testimony' is reliability."  *Id.* at 207 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).  "If the procedures used to obtain an identification are unduly suggestive, due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure."  *Id.* (citation and quotation mark omitted); *accord Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998).

"The first [and threshold] inquiry is 'whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator.'"  *Diaz*, 986 F.3d at 207 (quoting *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)); *see Perry v. New Hampshire*, 565

U.S. 228, 238–39 (2012) (due process concerns arising are "first" addressed).  Second, "[e]ven when the police use such a procedure . . . suppression of the resulting identification is not the inevitable consequence."  *Perry*, 565 U.S.at 238; *accord United States v. Eltayib*, 88 F.3d 157, 167 (2d Cir. 1996).

### 1.  Individual-1 (the "Neighbor")

The warrants declare that Individual-1 is "a person who is regularly present in the neighborhood" where the robberies occurred.  Premises Warrant ¶ 18; *accord* Cellphone Warrant ¶ 18.  The Neighbor was "shown surveillance video stills of" the October 2023 robbery.[3]  Premises Warrant ¶ 18.  The Neighbor "reported that s/he recognized" the person in the stills as someone "whom s/he sees regularly in the neighborhood, often wearing black pants, a grey hooded sweatshirt and tan shoes."  *Id.*  The Neighbor "further reported that the [the pictured individual] is often in the company of a person [the Neighbor] knows to be the [the individual's] sister, who lives in the residential building in proximity to Sutter Avenue and Schenck Avenue."  *Id.*  The Neighbor provided the name of the sister, a Ms. Takeysha Jeter, and stated that the pictured individual shown to her had "recently come to live with his sister in the Sutter Avenue residential building after being released from a lengthy term of imprisonment."  *Id.*

Santos does not claim any unduly suggestive practice was used to obtain this identification.  Instead, Santos attacks the Neighbor's reliability in identifying Santos from the surveillance footage, contending that it "is simply not reliable that a person who, at most, has seen Mr. Santos around the neighborhood would look at a photograph of someone with a face mask on and a hood covering their head and identify that person as Mr. Santos."  Santos Mot. at 11.  "Moreover, the

---

[3] The Government represents that the stills shown were taken from footage provided by the Neighbor from their own "surveillance camera" and that "[w]hile law enforcement was still with [the Neighbor] and reviewing his/her surveillance footage, law enforcement showed [the Neighbor] stills from the footage."  Gov't Opp. at 5-6.

government has not provided the defense with the actual stills that were shown to" the Neighbor. *Id.* Without any unduly suggestive identification conduct alleged or shown at this juncture, the Due Process Clause does not require suppression of the Neighbor's identification of Santos at trial. *See Dunnigan*, 137 F.3d at 128. Of course, the defense will have the opportunity to test the Neighbor's credibility and reliability of the identification at trial. "Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." *Id.* (quoting *Watkins v. Sowders*, 449 U.S. 341, 348 (1981)).

### 2. Individual-2 (the "Tenant")

Law enforcement also twice interviewed a second individual "who is regularly present in 815 Sutter Avenue" (the "Tenant"), which is where Santos was residing at the time of his arrest. *See* Cellphone Warrant ¶ 22.

The Government represents that on October 4, 2023, just a few days after the first robbery in September, the Tenant was shown three photographic stills taken from neighborhood security footage from the day of the September robbery.[4] Gov't Opp. at 4; *id.* at n.2; Ex. 4 to Gov't Opp. (the "September Surveillance Stills"); *see* Premises Warrant ¶¶ 9 Fig. 5, 22-23; Cellphone Warrant ¶ 22. The September Surveillance Stills, which are somewhat grainy, each show a Black male, bald, wearing a blue-grey hoodie with the hood portion down, black pants, and tan shoes. *See id.* The pictured individual appears walking on the sidewalk and is talking on what appears to be a black cellphone held up to his right ear. *Id.* The individual's face is only visible in profile. *Id.* The Government represents that the September Surveillance Stills were the only photos shown to

---

[4] Neither affidavit attached to either Cellphone or Premises Warrant describes when or how these identifications took place. These facts are taken from the Government's opposition brief. *See* Gov't Opp. at 4-7.

the Tenant and the Tenant "was <u>not</u> shown any other photos besides those."  Gov't Opp. at 4 (emphasis in original).

The Cellphone Warrant states that the Tenant "was shown surveillance video stills from the First Robbery, including the image . . . at Figure 1 [one of the September Stills], and s/he identified the individual pictured as SANTOS."  Cellphone Warrant ¶ 22 (citing *id.* ¶ 10, Fig. 1); *accord* Premises Warrant ¶ 22.  This is inaccurate.  As discussed below, the only actual identification provided by the Tenant is that the person depicted in the September Surveillance Stills – the individual depicted talking on the cellphone on the street – resided with Ms. Jeter in the Sutter Ave Residence, along with Ms. Jeter's two sons.  *Id.*; Gov't Opp. at 4.

That is, the Tenant was not an eyewitness to the September Robbery and did not identify the individual in the September Surveillance Stills as "Santos" by name.  Indeed, the Tenant did not know his name, but did know Santos' sister's name.  *Id.*  This was confirmed by the Government at oral argument.  *See* Transcript of Oral Argument on Suppression Motion ("OA Tr.") 22:1-12.[5]  The Tenant merely identified that person in the September Surveillance Stills as "liv[ing] in the subject premises."  Premises Warrant ¶ 23; Gov't Opp. at 4 (The Neighbor "reported that the *person* in [September Surveillance Stills] also lives in" the Sutter Ave Residence.) (emphasis added).  The Premises Warrant also states that the Tenant "understood" that the pictured individual "had recently been released from prison."  Premises Warrant ¶ 22.

---

[5] The cited portion of the transcript provides:
  THE COURT: My question is whether or not that witness identified the person in the surveillance stills as Santos.
  AUSA: He did not know the individual's name.
  THE COURT: My question is: Did he identify Santos by name?
  AUSA: By name, no.
  THE COURT: Okay. Because it seems to indicate on the premise warrant, and I'm at Paragraph 23, "Witness-2 identified Santos from the surveillance footage of the first robbery, and Witness-2 confirmed that Santos lived in the subject premises."

Subsequent to the Tenant's first identification of the individual in the September Surveillance Stills as living in the Sutter Ave Residence, the Government further investigated who had previously lived at the Sutter Ave Residence with Ms. Jeter.  *See* Gov't Opp. at 4.  The government identified and ruled out other relatives and a former romantic partner of Ms. Jeter. *See id.*  Ultimately, the results of this continued inquiry, corroborated by Santos' prior criminal history records, led the Government to the belief that it was Santos who was the perpetrator of the robbery.[6]  *See* Cellphone Warrant ¶¶ 19-20.

Then, on October 16, 2023, two days after the October Robbery, law enforcement agents spoke to the Tenant again.  Gov't Opp. at  6.  Agents showed the Tenant a USPIS wanted poster ("USPIS Wanted Poster") which contained two images captured from surveillance footage, as well as two individual photos of Santos himself.  *Id.*; *see* Ex. C. to Santos Mot., ECF 22-3 (the "October 16 Lineup").

The USPIS Wanted Poster was laid out with a header with the USPIS' full agency name and seal; the word "REWARD" appears in large bold letters below and, below that, the text: "Up to $150,000 ROBBERY OF A USPS LETTER CARRIER."  October 16 Lineup.  Below this text on the poster are two images.  The image to the left is a still taken from other surveillance footage of the September Robbery showing an individual in a blue hood and black pants accosting a mail carrier; the individual's back is to the camera and no face is showing and no skin tone can be discerned.  *Id.*  This still of the September attack appears to be taken from the same surveillance video proffered in the Premises Warrant.  *See, e.g.*, Premises Warrant ¶ 10, Fig. 7.

---

[6] Specifically, the Government discovered that Santos had been recently released from federal detention in March 2023 and had provided the U.S. Probation Office with the same address as the Sutter Ave Residence.  *See* Cellphone Warrant ¶¶ 19-20.

The image to the right used in the USPIS Wanted Poster is one of the same images contained in the September Surveillance Stills that was previously shown to the Tenant on October 4, 2023. *Compare* October 16 Lineup at 2, *with* September Surveillance Stills at 2; Premises Warrant ¶ 9, Fig. 5. The Tenant confirmed that the individual depicted in the USPIS Wanted Poster and other photos (which were of Santos) lived in the Sutter Ave Residence. Gov't Opp at 6. The Tenant did not identify the subject of the photos *as* Santos or the perpetrator of a mail carrier robbery. *See id.*

The Tenant identified the individual depicted as someone known to him as someone who resided at the Sutter Ave Residence with Taykesha Jeter. Santos' challenge to the identification procedures employed for this identification does not align neatly with the general suppression context where the identification to be suppressed is that of an eyewitness to the alleged crime. Nonetheless, courts address such identification challenges, often discussed as "confirmatory identifications," by engaging in the same 2-step analysis, asking: (1) whether an unduly suggestive process was employed with the identification at issue and, if so, (2) whether there are sufficient other indicia of reliability under *Neil v. Biggers* and adapting *Biggers*' reliability factors to situation as necessary.[7] *See United States v. Stephenson*, No. 20-CR-511 (AMD), 2021 WL 4972601, at *4 (E.D.N.Y. Oct. 26, 2021) ("*Biggers* typically concerns the reliability of an eye witness' identification; in this case, the defendant challenges a confirmatory identification by his parole officer" and continuing to opine about reliability); *Kelly v. Lee*, No. 11-CV-3903 (CBA), 2014 WL 4699952, at *10 (E.D.N.Y. Sept. 22, 2014); *Parker v. Lee*, No. 1:18-CV-10400 (GBD) (SDA), 2020 WL 13568020, at *7 (S.D.N.Y. Mar. 11, 2020), *R. & R. adopted*, No. 18-CV-10400

---

[7] The four *Biggers* factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

(GBD) (SDA), 2022 WL 7164257 (S.D.N.Y. Sept. 29, 2022); *United States v. Wilbern*, No. 17-CR-6016, 2019 WL 3852402, at *10 (W.D.N.Y. Aug. 16, 2019), *aff'd*, No. 20-3494-CR, 2022 WL 10225144 (2d Cir. Oct. 18, 2022) ("[P]resumably each prospective witness will take the stand and identify Defendant as someone whom he or she has known, be shown surveillance photographs, and testify that, in his or her opinion, it is the Defendant in the photographs."); *cf. Espinal v. Duncan*, No. 00-CV-4844 (RWS), 2000 WL 1774960, at *2 (S.D.N.Y. Dec. 4, 2000) (citing *Biggers*, 409 U.S. at 199-201) ("This 'confirmatory identification' rule tracks the federal standard that identification procedures violate due process only if they yield 'unreliable' identifications.").

Divorced of the circumstances in which it was used, presenting the USPIS Wanted Poster – which contained a photograph of a robber in progress next to two actual photos of Santos – might be unduly suggestive to any witness that Santos committed the robberies he was indicted on.  But on the facts before the Court, the Tenant never claimed to be an eyewitness or otherwise have identified Santos as the perpetrator of the robbery because the Tenant did not witness the robbery; rather the Tenant only confirmed that the individual matching the person depicted in the September Surveillance Stills, that the Government believed to be Santos, lived at the Sutter Ave Residence. *See supra* Part A.2.(a)-(b).

"The primary evil to be avoided" by suppressing identifications that are unduly suggestive "is a very substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 198 (cleaned up); *Diaz*, 986 F.3d at 206-07 (citing *Concepcion*, 983 F.2d at 377) ("Due process protects 'the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification.'").  That is, the purpose of suppression in the identification context is to prevent from introduction to the jury identification evidence that is so "corrupt[ed]" by use of gratuitously suggestive procedures that to allow it to be heard and

considered would create a "corrupting effect" on determining the defendant's guilt. *Manson*, 432 U.S. at 114 (against indicia of reliability "is to be weighed the corrupting effect of the suggestive identification itself").

 Here, the use of the USPIS Wanted Poster, containing a still from the September Surveillance Stills, which the Tenant had previously seen, was not unduly suggestive as to the relevant identification: that the Tenant identified someone matching the individual pictured in the September Surveillance Stills as the person who also lived in the Sutter Avenue Residence.  Put another way, the follow-up identification on October 16 where the USPIS Wanted Poster was shown to the Tenant and contained a photographic still the Tenant had previously seen, is nothing more than confirmatory that Santos indeed lived in the building.  Without any unduly suggestive procedure demonstrated to have been used to obtain this confirmatory identification, such an identification will be allowed at trial where its reliability can then be tested in the crucible of direct and cross examination.  *See, e.g.*, *Espinal*, 2000 WL 1774960, at *3 (The witness's "prior acquaintance with Espinal established that the in-court identification was reliable notwithstanding the prior photographic display."); *Kelly*, 2014 WL 4699952, at *8 (The witness "was sufficiently familiar with Kelly from the apartment complex where they both resided, rendering her identification of Kelly during the photo array merely confirmatory.").

### 3.  Individual-3 ("Mail Carrier-2")

On October 16, 2023, the USPS mail carrier who was the victim of the October Robbery ("Mail Carrier-2") identified Mr. Santos in a "six-photo array."  Santos Mot. at 7; *See* Ex. 5 to Gov't Opp. ("Photo Array"), ECF 25-5.

The Photo Array contained six photos of Black men, all bald and of a similar middle-age. *See* Photo Array.  All the men pictured also have various forms of beard-type facial hair with some

degree and mixture of white-grey coloring.  *Id.*  Santos' photo is the fourth out of six.  *See id.*
Santos states that the Government has "not produced any police notes or reports relating to the
circumstances of the identification."  Santos Mot. at 12.  The Government represents in its brief
that Mail Carrier-2 was shown each photo individually, one-by-one, at least twice.  *See* Gov't Opp.
at 6-7.  "When displaying the photographs one-by-one for a second time, Mail Carrier-2 stopped
at the defendant's photo and indicated a confidence level of 7 out of 10 that the male in the fourth
photograph—the defendant—robbed her."  *Id.* at 7.  This confirmation is corroborated by writings
on the Photo Array.  *See id*. at Bates Stamp No. EDNY_00085.

Given Santos' current lack of information beyond the Government's representations,[8]
Santos' only cognizable argument as to unduly suggestive police conduct is that the "police chose
a photo of Mr. Santos wearing a gray crew neck hooded sweatshirt –drawing a connection between
him and one of the few characteristics of the robber that Mail Carrier-2 was able to originally
provide."  Santos Mot. at 12.  However, this argument is undercut by the fact the following two
men are also wearing what appear like zip-up hoodies or darker or grey color.  *See* Photo Array at
Photos 5/6, 6/6.  Such an array was not designed such that Santos "so stood out from all of the
other photographs as to suggest to an identifying witness that [that person] was more likely to be
the culprit."  *Eltayib*, 88 F.3d at 166.  As the threshold inquiry as to unduly suggestive lineup has
not been satisfied on the facts at hand, the Court also cannot grant suppression of this evidence at
trial.  However, this ruling is without prejudice should the facts surrounding the lineup change.

---

[8] At oral argument, Santos' counsel stated that "in terms of the actual procedure itself, I don't have any facts to dispute
or to provide regarding suggestiveness.  Clearly, neither myself nor Mr. Santos were present for that procedure and
we've gotten no documentation about the procedure itself aside from the photographs and what the Government
provided in their opposition."  OA Tr. 9:12-17

As there has been no showing of unduly suggestive practices or procedures employed in any of the three identifications raised to the Court, Santos' requests for a *Wade* hearing are denied without prejudice.

## B. Suppression of Cellphone Evidence

Santos claims that the Cellphone Warrant violated his Fourth Amendment rights because "there was no probable cause to believe that evidence of the robberies would be found on Mr. Santos's cell phone as the Cell Phone Warrant lacked a sufficient nexus between the property to be searched – Mr. Santos's cell phone – and the alleged criminal activities – the September 30 and October 14 robberies." Santos Mot. at 4, 14 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Santos further argues that the good-faith exception does not apply. *Id.* at 4, 20-21. Santos contends, in the alternative, that he has proffered sufficient evidence to warrant a *Franks* hearing on the matter. *Id.* at 4, 16-20; *see also* Santos Reply at 4-13.

### 1. Standard of Review of a Magistrate Judge's Probable Cause Determination

The Fourth Amendment prohibits "unreasonable searches and seizures" and requires that "no warrants shall issue, but upon probable cause, supported by Oath." U.S. CONST. amend. IV; *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008). A search executed pursuant to a warrant signed by a neutral magistrate and supported by probable cause is presumptively reasonable. *McColley v. Cty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014).

"The Supreme Court has explained that 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *Falso*, 544 F.3d at 117 (quoting *Illinois v. Gates,* 462 U.S. 213, 232 (1983)). "The task of the issuing magistrate or judge is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [them], . . . there is a

fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Gates*, 462 U.S. at 238) (alteration, footnote, and quotation marks omitted). "This standard does not demand 'hard certainties,' but it does require more than a 'hunch,' the latter being insufficient to support even an investigative stop." *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 231) (citation omitted). Instead, "probable cause must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians" would rely. *Id.* (citation omitted).

A magistrate judge's determination of probable cause to search is to "be paid great deference by reviewing courts." *Spinelli v. United States*, 393 U.S. 410, 419 (1969). This Court's "task," therefore, "is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238); *accord United States v. Boles,* 914 F.3d 95, 102 (2d Cir. 2019). "The deference owed to a magistrate judge's determination does not, of course, preclude this Court from properly concluding that a warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of circumstances." *United States v. Bertini*, No. 23-CR-0061 (PGG), 2023 WL 8258334, at *4 (S.D.N.Y. Nov. 29, 2023) (cleaned up).

### 2. Nexus Between the Santos' Criminal Activities and Santos' Use of a Cellphone

A search warrant must "establish[] a sufficient nexus between the criminal activities alleged" and the place or object to be searched. *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004); *accord United States v. Chang*, No. 18-CR-0681 (NGG), 2024 WL 1308775, at *11 (E.D.N.Y. Mar. 27, 2024) (analyzing nexus in the cellphone search context). "A showing of nexus

does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *Singh*, 390 F.3d at 182 (cleaned up).

Here, Santos challenges that the Cellphone Warrant "lacked a sufficient nexus between the property to be searched – Mr. Santos's cell phone – and the alleged criminal activities – the September 30 and October 14 Robberies."[9]   Santos Mot. at 4, 14; Santos Reply at 4.   Santos specifically attacks the magistrate judge's reliance on Inspector Vernon's professional experience to conclude that Santos used a cellphone. *See* Santos Reply at 6-8.

At the outset, before turning to the value of law enforcement opinions, it is essential to state that precedent requires that at least some of "facts presented," *Singh*, 390 F.3d at 182, in a search warrant affidavit be "particularized with respect to" the defendant in order to satisfy the nexus inquiry. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] search or seizure of a person must be supported by probable cause *particularized with respect to that person*.") (emphasis added); *Falso*, 544 F.3d at 124 (requiring the government to gather "evidence *particularized* to the target of the search" before the warrant application is made) (emphasis added); *cf. United States v. Coreas*, 419 F.3d 151, 156 (2d Cir. 2005) (Noting that the "exercise of trying to stretch the remaining unparticularized allegations to uphold the search seems counterproductive" to a probable cause review).   This is no less is true in the cellphone search context.   *See, e.g.*, *Lauria*, 70 F.4th at 129 (reviewing the "'facts' relating specifically to [defendant] or to his [] cell phone" in the probable cause context); *see, e.g.*, *United States v. Arias-Casilla*, No. 21-CR-218-1 (AT), 2022 WL 2467781, at *4 (S.D.N.Y. July 6, 2022) (finding a substantial basis to uphold a magistrate judge's probable cause determination where the "affidavit

---

[9] Santos does not challenge the propriety of the seizure of the phone incident to his arrest.  Nor does Santos challenge the scope or breadth of the Cellphone Warrant.  Lastly, Santos does not challenge the validity of the Premises Warrant nor the initial arrest warrant (nor the subsequent indictment)—each of which required probable cause as to Santos committing at least the October 2023, the robbery—are invalid.

also sets forth 'particularized evidence' connecting the seized phones to Defendant's alleged crimes, specifically noting that Defendant used a cellphone to communicate with [the Informant] to coordinate delivery of the sample to him[.]") (cleaned up).

Turning to the issue of a law enforcement affiant's professional or experience-based opinions, the Second Circuit has consistently "recognized" that an affiant law enforcement agent's professional experience either with the subject herself or type of criminal conduct at issue is an "important factor" to be considered by the magistrate judge. *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) ("[W]e have recognized that a law enforcement officer's experience and training may permit the officer to discern probable cause from facts and circumstances where a layman might not.") (internal quotations omitted); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (noting that a "number of cases have ruled that an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application" as to good faith); *United States v. Ukhuebor*, No. 20-MJ-1155 (LDH), 2021 WL 1062535, at *3 (E.D.N.Y. Mar. 19, 2021) (quoting *United States v. Benevento*, 836 F.2d 60, 71 (2d Cir. 1987)) ("Special Agent Turczak's expert opinion 'is an important factor to be considered in making a probable cause determination.'").

Nonetheless, the value of a law enforcement agent's professional or experience-based opinion is subject to certain boundaries when applying for a search warrant.  Namely, a law enforcement officer's professional opinion, and any reasonable inferences that may be gleaned from it, must be considered in tandem with the actual, particularized facts sworn in the search affidavit regarding the place or item to be searched.  The reason being that "[p]ermitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing

virtually automatic searches of any property used by a criminal suspect." *Ukhuebor*, 2021 WL 1062535, at *3 (quoting *United States v. Guzman*, No. 97-CR-786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998)) (quotation mark omitted); *accord United States v. Garcia*, No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *7 (D. Conn. July 28, 2023).   Therefore, while experience-based proffers in a search affidavit are "important," the Second Circuit has also caveated their effect, opining that "standing alone,"  generally such averments are insufficient "to establish a link between the" defendant "and their prior criminal activity." *Benevento*, 836 F.2d at 71; *Ukhuebor*, 2021 WL 1062535, at *3 (A "government agent's expert opinion, standing alone, might not be sufficient to establish a link between the item to be searched and the alleged criminal activity."); *Garcia*, 2023 WL 4850553, at *7 (An "officer's opinion, standing alone, is generally not sufficient to establish a link between the item to be searched and the alleged criminal activity.") (quotation marks omitted).

Putting these principles together, an agent's relevant training and experience can be a powerful "supplement" to other sworn facts establishing probable cause.  *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023) ("Agent Ford properly invoked his training and experience investigating felons to supplement his account of the facts establishing probable cause to search Defendant's online accounts for evidence of Defendant's scooter acquisition.").  Still, there must be sufficient factual matter particularized to the defendant that "nudge[s]" the officer's professional or experience-based opinion from a "hunch" or "mere suspicion" to "fair probability that contraband or evidence of a crime will be found[.]" *Lauria*, 70 F.4th at 128; *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007); *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023).  Put another way, there must be "just enough case-specific evidence to nudge his training and experience across the line from

sheer speculation to probable cause." *Garlick*, 2023 WL 2575664, at *6; *accord Bertini*, 2023 WL 8258334, at *9; *Garcia*, 2023 WL 4850553, at *7. It is therefore incumbent on the Court to parse the factual allegations in the Cellphone Warrant from Inspector Vernon's training and experience based assertions.

### a. Particularized Facts and Experience Based Assertions

Presuming the veracity of the statements in Inspector Vernon's Cellphone Warrant affidavit, a review of the Cellphone Warrant provides the following relevant "hard" factual allegations with respect to nexus– that is factual averments "particularized with respect to" Santos' use of a cellphone. *See Pringle*, 540 U.S. at 371.

- First, there was probable cause to believe that Santos committed the two arrow key robberies at issue. Cellphone Warrant ¶¶ 6, 25.[10]

- Second, Santos was captured by surveillance footage on the phone using a "cellular device approximately two hours before committing the [September] Robbery." *Id.* ¶ 25.

- Third, the cellphone recovered at the Sutter Avenue Residence belonged to Santos. *Id.* ¶¶ 24-25.[11]

- Fourth, that "no arrow keys were recovered" in the search of the Sutter Ave Residence. *Id.* ¶ 27.

---

[10] By the time law enforcement applied for the Cellphone Warrant a grand jury had already returned an indictment as to Santos for both robberies. *See* Indictment. The Cellphone Warrant cited to the Indictment and may be considered in the general legal "fact" in the context of probable cause for the warrant at issue and the sub-issue of whether there was probable cause of criminal activity. *See United States v. Watson*, No. 23-CR-82 (EK), 2023 WL 7300618, at *5 n.7 (E.D.N.Y. Nov. 6, 2023) ("[N]umerous district courts have considered indictments' allegations in evaluating probable cause.") (collecting cases); *United States v. Mouzon*, No. 16-CR-284 (CM), 2016 WL 7188150, at *4 (S.D.N.Y. Dec. 2, 2016) ("Judge Mitchell would have been all but justified in concluding, based solely on the facts alleged in the Indictment, that there was probable cause existed to believe that Gaymon had engaged in criminal activity."); *United States v. King*, No. 3:17-C-R149 (JBA), 2018 WL 4005734, at *5 (D. Conn. Aug. 22, 2018) ("Magistrate Judge Garfinkel was entitled to consider that indictment in determining whether Special Agent King's affidavit supported a finding of probable cause.").

[11] There is no dispute that the phone recovered from the Sutter Ave Residence pursuant to the execution of the Premises warrant belonged to Santos. Santos' sister confirmed to law enforcement that Santos slept on the couch in the Sutter Ave Residence and also that the seized phone belonged to him. Cellphone Warrant ¶ 24; *see also* Santos Mot. at 8, 15 ("The warrant authorized the search of *Mr. Santos's cell phone"*; "To justify a search *of Mr. Santos's cell phone* . . . .") (emphasis added).

Crucially missing, however, is any averred factual connection between Santos' cellphone and any purported use, by Santos, of a cellphone in connection with either robbery and theft. As the Government notes, this is required to sustain the warrant. *See* Gov't Opp. at 8 (a search of a phone requires that "there is probable cause [to] believe that the defendant used a phone in his criminal conduct" (citing *United States v. Watson*, No. 23-CR-0082 (EK), 2023 WL 7300618, at *6 (E.D.N.Y. Nov. 6, 2023)).

To this end, Inspector Vernon provided two additional experience-based factual assertions in the Cellphone Warrant based on his seven years of "training and experience"[12] to link Santos' phone to a fair probability the evidence of a crime – either the robberies themselves or the selling or counterfeiting of the arrow keys – would be found on the phone:

- First, that postal arrow keys are "valuable to criminals, who counterfeit, sell, and/or use them directly to steal mail from relay boxes."[13] *Id.* ¶¶ 7, 26. .
- Second, that "criminals rely on cellular telephone devices to arrange for the counterfeiting, sale, and use of arrow keys, whether to communicate with counterfeiters, other criminals, or to surveil when relay boxes can be targeted." *Id.*

From these particularized facts and experiential-based assertions, Inspector Vernon believed, and the magistrate judge accepted, the inferential conclusion that "there is probable cause to believe that [Santos] has already used his cellular device to sell, counterfeit, or otherwise use the arrow key." *Id.* For the following reasons, these facts, taken together, do not support a nexus for either committing the robberies or selling the keys to buyers or counterfeiters.

---

[12] Inspector Vernon has spent "approximately five years" with USPIS and three and a half years in the NYPD "investigating and tracking individuals involved in a variety of crimes, including robberies, burglaries and other violent crimes." Cellphone Warrant ¶ 2. Inspector Vernon has also "conducted physical surveillance and interviewed civilian witnesses and victims" and "executed numerous arrests and search warrants, including search warrants for cellular devices similar to the one" at issue. *Id.*

[13] This experience-based assertion is not challenged by Santos.

### b. Insufficient Particularized Evidence Showing Nexus Between Cellphone and Commission of the Robberies

The Cellphone Warrant does *not* contain any particularized factual matter demonstrating that Santos used a cellphone to plan or execute either robbery by himself or that Santos used a cellphone to communicate or conspire with others to do so.  Rather, the particularized facts of the Cellphone Warrant paint a picture of Santos, acting alone to rob postal carriers near his residence, in broad daylight, only to flee back to his apartment.  *See generally* Cellphone Warrant; Premises Warrant.

The closest the Cellphone Warrant comes to claiming a factual link between use of a cellphone in connection with the act of robbing postal workers is that Santos was putatively captured using a cellphone approximately two hours before the September Robbery and Inspector Vernon's opinion that "criminals rely on cellular telephone devices . . . to surveil when relay boxes can be targeted."  Cellphone Warrant ¶¶ 7, 10.  But notably, the criminal activity factually alleged is not theft of mail from relay boxes, but rather robbery of mail carriers and theft of their arrow keys.

Further, it is unclear why Santos would need a cellphone to target or surveil relay boxes, which are typically found in plain view on city streets.  *See, e.g.*, *United States v. Bowles*, 428 F.2d 592, 593 (2d Cir. 1970) (describing thefts from relay boxes on 169th Street and Morris Avenue).  *Cf. Bertini,* 2023 WL 8258334, at *8 (opining that there is "no reason to believe" affiant's assertions that defendant surveilled target bank using a cellphone when defendant "lived a block away from the Investors Bank and had burglarized the bank before" and concluding "there is no reason to believe that he would have used his cell phone to find the bank or to conduct surveillance of it").

Importantly, assuming the fact that the person pictured in the surveillance photos was Santos (which he disputes), his simple use of a cellphone on the day of the robbery within the two hours before the commission of one robbery does not make it reasonable to believe he used it to facilitate a robbery. There are no call logs or other evidence proffered by the Government tying the captured call to any furtherance of the robbery. Moreover, the Second Circuit has opined that "probability" of finding evidence of a crime "diminishes as the call becomes more temporally remote from the crime and as the number of calls placed and received increases." *Lauria*, 70 F.4th at 130. Had there been particularized evidence tying Santos' putative use of a phone before the robbery to the actual execution of the robbery, the calculus may be different. *See id.* (explaining "if Lauria's -3972 cell phone initiated the call within minutes of the robbery, and made and received few other calls around that time, that might provide a reasonable basis to think it probable that the subject of the call was the robbery and that the call recipient was a confederate in the crime"); *see also Bertini,* 2023 WL 8258334, at *9.

Lastly, the mere fact that Santos also possessed and used a cellphone at any time does not allow for a "common-sense" inference that a cellphone would be used to execute the robberies. Gov't Opp. at 9; *see Singh*, 390 F.3d at 182. The Second Circuit has acknowledged that "modern cell phone usage is so ubiquitous" that courts should take caution analyzing probable cause. *Lauria*, 70 F.4th at 128; *see also Riley v. California*, 573 U.S. 373, 385 (2014) (remarking that "modern cell phones" are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"). Accordingly, without more case-specific facts, common sense cannot be the sole basis for authorizing a search warrant for the phone.

Indeed, where probable cause has been found for cellphone searches, more particularized factual matter is present.  *See Bertini*, 2023 WL 8258334, at *10 (collecting cases).  For example, recently in *United States v. Rutledge*, No. 23-CR-269 (FB), 2024 WL 1834801, at *3 (E.D.N.Y. Apr. 26, 2024).[14]  There, the court found there was sufficient basis to grant the search warrant given, among other indicia, that the officers had obtained and reviewed T-Mobile records associated with the defendant and his co-conspirator's phones showing that the "phones communicated with one another 11 times between 6:23 p.m. and 7:56 p.m., several hours before the robbery" and that the "flurry of calls stopped after the robbery."  *Id.*, at *1.  This pattern is replete in the caselaw.  *See, e.g.*, *Watson*, 2023 WL 7300618, at *7 ("At the time of the Devices' seizure, Agent Williams knew that Watson's alleged (and potentially ongoing) criminal conduct involved sending and receiving electronic communications and other data."); *United States v. Harvey*, No. 21-CR-335 (SJ), 2022 WL 684050, at *8 (E.D.N.Y. Mar. 8, 2022) ("Specifically, the fact that Harvey was recorded using a cellphone moments after the March 15, 2021, attempted robbery and shooting establishes the evidentiary nexus between his cellphone and criminal activity."); *United States v. Disla Ramos*, No. 22-CR-431 (LJL), 2022 WL 17830637, at *7 (S.D.N.Y. Dec. 21, 2022) ("[T]he Target Cellphone—and by extension [the defendant]—was tied to the crime through evidence that an individual using the phone was in contact with another participant in the crime approximately an hour after the robbery."); *Arias-Casilla*, 2022 WL 2467781, at *4 (The search "Affidavit also sets forth 'particularized evidence' connecting the seized phones to Defendant's alleged crimes, specifically noting that Defendant 'used a cellphone

_____

[14] While the defendant in *Rutledge* challenged the warrant granting law enforcement access to search his cell site location information ("CSLI") and not the cellphone itself, the probable cause analysis remains functionally the same.: "The Government can show probable cause that Rutledge (1) was carrying his cell phone at the time of the robbery, such that his phone's location would yield evidence of the robbery; or (2) that he used his cellphone at an earlier time in connection with or to facilitate the robbery."  *Id.* at *3 (citing *Bertini*, 2023 WL 8258334, at *7).

to communicate with [the Informant]' to coordinate delivery of the sample to him[.]"); *United States v. Sharma*, No. 18-CR-340 (LGS), 2019 WL 3802223, at *6 (S.D.N.Y. Aug. 13, 2019) ("Sharma does not dispute that the agents had probable cause to believe that the iPhones and laptop contained evidence of Sharma's participation in the scheme to defraud. Indeed, the arrest warrant includes allegations that Sharma sent and received text messages and email communications in connection with the fraud.").

Further, this is not a case where Santos is charged with a conspiratorial crime where it might be reasonable to infer he was communicating with confederates about his alleged criminal activity. *See, e.g.*, *Rutledge*, 2024 WL 1834801, at *1 ("Agent Quinn's theory was that the 11 phone communications suggested that Rutledge and Sullivan used the phones to plan and coordinate the armed robbery . . . "); *see United States v. Brown,* 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) ("This Court is entitled to rely on [] opinion, as well as the commonsense notion that an individual engaged in a conspiracy may have evidence of that conspiracy . . . on communication devices used by the individual."). In fact, Inspector Vernon also asserts, based on his experience, that perpetrators of such robberies find keys valuable not only to sell to others but also "use them directly to steal mail from relay boxes" themselves. Cellphone Warrant ¶ 7.

Lastly, theft of arrow keys is also outside of the bounds of other crimes, such as narcotics trafficking or complex monetary frauds, which have been judicially observed to involve the use of cellphones as part of the proverbial "tools of the trade" of the subject crime. *See United States v. Robinson*, No. 16-CR-545 (S-3)(ADS), 2018 WL 5928120, at *16 (E.D.N.Y. Nov. 13, 2018) (collecting cases regarding narcotics trafficking); *Garcia,* 2023 WL 4850553, at *7 n.4; *Watson*, 2023 WL 7300618, at *5 (discussing financial crimes).

Because there are no particularized facts that would allow even "reasonable inference" that Santos used a phone in connection with the lead up to or the *actus reus* of the two robberies or that Santos used a phone to conspire or communicate with another person to do so, there is no probable cause to search Santos' phone on this ground.  *See Singh*, 390 F.3d at 182; *Bertini*, 2023 WL 8258334, at *9 (granting suppression motion where "the agent's affidavit alleges no facts suggesting that Bertini ever (1) used his cell phone in connection with committing or facilitating a bank burglary; (2) used his cell phone to communicate with anyone about committing a bank burglary; (3) carried his cell phone while committing a bank burglary; or (4) had reason to use or carry his cell phone in connection with committing or facilitating the bank burglaries at issue.").

### c. Insufficient Evidence Showing Nexus Between Cellphone and Communicating With Counterfeiters

Inspector Vernon's assertion that Santos "used his cellular device to sell, counterfeit, or otherwise use the arrow key" suffers from the same infirmity.  Cellphone Warrant ¶¶ 7, 27.  The Government's proffered inferential chain for this conclusion comes from Inspector Vernon's professional opinion that (1) arrow keys are valuable to counterfeiters and/or willing buyers; (2) "criminals rely on cellular telephone devices to arrange for the counterfeiting, sale, and use of arrow keys, whether to communicate with counterfeiters, other criminals"; and (3) the particularized fact that no arrow keys were found in the Sutter Ave Residence.  *Id.* ¶¶ 7, 26.  Together, the Government contends, this leads to the "common-sense conclusion that there was a fair probability that evidence would be found on the phone" because a lack of arrow keys recovered is "consistent" with them having been sold to counterfeiters.  Gov't Opp. at 8-9.

For the same reasons explained above, this inferential chain does not provide a substantial basis for a probable cause finding because it hinges solely on Inspector's Vernon's professional opinion that individuals who commit arrow key thefts "rely on cellular telephone devices" to

communicate with third parties after the fact to sell or otherwise dispose of the arrow keys. Cellphone Warrant ¶¶ 7, 26. "Although the Court gives substantial deference to the probable cause finding of the issuing judge and recognizes that the issuing judge may rely on common sense in making such a determination, the limited information presented here requires too far an inferential leap." *Garcia*, 2023 WL 4850553, at *8. Without any further particularized facts indicating that Santos ever communicated with any buyer or counterfeiter using a cellphone, it is not a "fair probability" that he used that cellphone to sell or counterfeit the arrow keys but rather an impermissible "hunch" only moored to Inspector Vernon's professional opinion on how certain criminals act. *See Garcia*, 2023 WL 4850553, at *7 ("The Court concludes that the affiants' blanket generalization about how 'people who commit crimes' act here was not sufficient to 'nudge' the affidavit over the line and establish probable cause to search Garcia's cell phone."); *accord Rutledge*, 2024 WL 1834801, at *3. Again, "[w]hat is missing here is some 'case-specific evidence' that 'nudge[s] [Inspector Vernon's] training and experience across the line from sheer speculation to probable cause.'" *Bertini,* 2023 WL 8258334, at *9 ("Acknowledging that cell phones have become ubiquitous in our society, a finding of probable cause cannot be premised solely on an agent's assertion that most people carry cell phones most of the time."). An "illegal purpose, notwithstanding the absence of particularized evidence indicating" actual illegal conduct "cannot be squared with the general proscription against finding probable cause based solely on an individual's 'mere propinquity to others suspected of criminal activity.'" *Falso*, 544 F.3d at 118–19.

Ultimately, upon Court's review, and giving due deference to the magistrate judge, the Cellphone Warrant was issued without sufficient probable cause connecting Santos' cellphone with the two robberies or any purported disposal of the arrow keys to a third party. Put another

way, there are simply insufficient facts beyond opinion establishing "a reasonable linkage between the crimes for which the defendants were sought," assault and robbery of two postal workers and theft of arrow keys, "and the places to be searched," Santos' cellphone. *United States v. Levasseur*, 619 F. Supp. 775, 791 (E.D.N.Y. 1985). Further, the Cellphone Warrant is barren of any particularized evidence that Santos engaged in any other criminal conduct, namely selling arrow keys. All that remains is a suspicion based on Inspector Vernon's professional belief as to how all arrow-key-robbers act, which fails to provide anything more than an impermissible "hunch." *Lauria*, 70 F.4th at 128.

### 3. The Good Faith Exception

"[I]n *United States v. Leon,* the Supreme Court recognized an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011) (quoting *United States v. Leon,* 468 U.S. 897, 922 (1984)). "The Court reasoned that, in those circumstances, '[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *Id.* at 99-100 (citing *Leon*, 468 U.S. at 921).

"The good faith exception, however, does not apply '(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'" *Harvey*, 2022 WL 684050, at *7 (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923)). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." *Clark*, 638 F.3d at 100 (citation and quotation marks omitted).

Here, Santos argues that the good faith exception does not apply relying on the first and third *Leon* scenarios.  *See* Santos Mot. at 20-21; Santos Reply at 13-15.   The Court begins by analyzing the third *Leon* scenario, a lack of indicia of probable cause.

Santos argues that the Cellphone Warrant "relies almost exclusively on Inspector Vernon's training and experience to connect [] Santos's cellphone to the charged offenses" and consequently "Inspector Vernon's affidavit was so lacking in indicia of probable cause connecting [] Santos's cellphone to the charged offenses that it was objectively unreasonable for law enforcement to rely upon the warrant."  Santos Reply at 14-15.

"*Leon* instructs that officers cannot reasonably rely on a warrant issued on the basis of an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Clark*, 638 F.3d at 103 (quoting *Leon*, 468 U.S. at 923). "Such a concern most frequently arises when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations." *Id.* (collecting cases opining the same).  "At the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause. Such cases almost invariably demonstrate reasonable reliance." *Id.*

The Government's sole contention in opposition is that the Cellphone Warrant is "[f]ar from being bare-bones" and contains "detailed factual allegations describing the defendant's crimes and why there was reason to believe that the defendant's phone would contain evidence" of those crimes.  Gov't Opp. at 17.  The Government is half correct on this score.  The Cellphone Warrant does contain many factual allegations as to Santos but, as explained above, it is entirely devoid of factual allegations connecting Santos *to using a phone* to either effectuate or commit robberies or to communicate with buyers or counterfeiters after the fact to dispose of the stolen

arrow keys.  At most, the Cellphone Warrant only contains a single factual allegation that a person putatively claimed to be Santos was walking and using a phone two hours prior to one robbery. *See supra* Part B.2.  All that is supplied as to probable cause to believe that the cellphone may contain contents of the crimes are Inspector Vernon's own professional opinions about the type of criminal that commits arrow key robberies.  *Id.*  It was also Inspector Vernon who swore both affidavits put forth to respective magistrate judges and assisted in executing the warrants.  *See* Premises Warrant; Cellphone Warrant; Santos Mot. at 23.

The Court concludes that in the Second Circuit's terms, the affidavit is so "bare bones" as to probable cause to search the phone to the point it would have been unreasonable for Inspector Vernon or any other agent to have relied on it, even though Magistrate Judge Bloom signed it.  "If the officer's good faith could be established by the mere fact that the judge approved the warrant application, then the good faith exception would swallow the rule that affidavits must provide a substantial basis for determining probable cause."  *Bertini*, 2023 WL 8258334, at *12 (cleaned up).  *But see, e.g.*, *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (good faith exception applied where the warrant application "was not a 'bare bones' affidavit, but rather contained many objective facts" connecting premises to be searched to with narcotics, including packages mailed to that premises).

The Court's decision is also instructed by recent cases addressing the same issue and raised by Santos.  *See* Santos Reply at 15.  In *Bertini*, the Federal Bureau of Investigation ("FBI") sought a warrant for Bertini's cellphone data and his cellphone in connection with an attempted bank robbery.  2023 WL 8258334, at *1.  The Court found there was no probable cause given that the search warrant affidavit was "devoid of factual allegations suggesting that Bertini had carried or used his cell phone in connection with or to facilitate either bank burglary" and instead probable

cause was only supplied to the magistrate judge via the agent's "naked assertions" regarding criminal conduct based on his professional experience. *Id.*, at *12. The *Bertini* court concluded there could be no good faith reliance on the warrant because "'[n]otwithstanding the deference that magistrates deserve,' reviewing courts are instructed 'not [to] defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining . . . probable cause.'" *Id.* (quoting *Leon*, 468 U.S. at 915).

Similarly, in *Garcia*, the court found both a lack of probable cause and good faith in the government's application to search a cellphone in connection with a homicide. 2023 WL 4850553, at *8. The Court explained that nothing in the search warrant affidavit or

> in the warrant application package, provides any facts upon which the issuing judge could find that there was a fair probability that contraband or evidence of the crime in question—homicide—would be found on *Garcia's cell phone*. Indeed, nowhere in the affidavit's summary of the facts before, during, or after the homicide are cell phones or other electronic devices even mentioned. Thus, even giving substantial deference to the issuing judge's finding of probable cause, the affidavit provided an insufficient basis to believe that evidence of the homicide would be found on Garcia's phone.

*Id.* (footnote omitted).

"Accordingly, given that this warrant was not supported by probable cause, was not sufficiently particularized, and was extraordinarily overbroad, the Court [found] that the warrant was so defective that the detectives had no objectively reasonable basis for relying upon it." *Id.* at *13.

And, so too here. Given the lack of probable cause due to insufficient facts tying Santos to ever using a cellphone to commit or further his crimes beyond conjecture of the postal inspector swearing the warrant, "reliance on this warrant was not 'objectively reasonable.'" *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 164 (2d Cir. 2019) (quoting *Leon*, 468 U.S. at 922). As there was no indicia of probable cause contained in the warrant in the first place, reliance on it was not objectively reasonable.

Lastly, application of the exclusionary rule here comports with its policy purpose, which is to deter police misconduct and uphold the promises of the Fourth Amendment for citizens to be protected against unreasonable searches and seizures by excluding at trial evidence obtained by Fourth Amendment violations. *Clark*, 638 F.3d at 99. "Application of the exclusionary rule depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" *United States v. Rosa,* 626 F.3d 56, 64 (2d Cir. 2010) (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)). "Moreover, '[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.'" *Id.* (quoting *Herring*, 555 U.S. at 143). "Thus, in deciding to suppress evidence," a court looks "to whether police conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* (cleaned up). At bottom, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in [Supreme Court jurisprudence], the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144.

The legal precedents requiring a showing of particularized nexus between the crime and the place or item to be searched have been long-established and heeded by law enforcement agents seeking to search cellphones, as discussed above. *See supra* Part B.2(a)-(c); *see Davis v. United States*, 564 U.S. 229, 241 (2011) ("Responsible law enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." (citation omitted)). Here, prosecuting agents had 15 days between finding Santos' cellphone on October 20 and the Cellphone Warrant application on November 3, 2023, to

investigate and proffer more particularized facts connecting Santos' purported crimes to his use of a cellphone.   For example, the agents may have simply subpoenaed his service provider to determine if there was any such "flurry" of calls closer to the time of the robbery and further seek CSLI data.  *See, e.g.*, *Rutledge*, 2024 WL 1834801, at *1, 3-5; *United States v. Moran*, 349 F. Supp. 2d 425, 433 (N.D.N.Y. 2005) ("The telephone toll records . . . were obtained by subpoena."). Equally, as indicated in both warrants, there were witnesses that could be canvassed who regularly saw him, including his sister and her two adult sons who lived with Santos.  Premises Warrant ¶ 22.

Instead, the Cellphone Warrant largely rehashed the Premises Warrant and relied on "sheer speculation" provided by law enforcement experience because it contained no facts that could directly or even indirectly support probable cause standing alone.  Cellphones are "ubiquitous" and used for benign and deeply personal purposes just as much as, if not more, for criminal purposes.  *Lauria*, 70 F.4th at 128; *see Carpenter v. United States*, 585 U.S. 296, 311, 320 (2018) (opining on the "deeply revealing nature of [cellphone data], its depth, breadth, and comprehensive reach," including to an individual's location history and his "familial, political, professional, religious, and sexual associations"); *Riley*, 573 U.S. at 396 (noting "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house").  Simply becoming a suspect of a crime, even to the point of probable cause, cannot and does not *per se* deprive that suspect of his Fourth Amendment right to be "secure" in the private contents of his "effects," like a cellphone, without a proper showing of probable cause to search that phone.  U.S. CONST. amend. IV.   While perhaps not deliberate, law enforcements failure to provide the facts sufficient for establishing nexus in the face of binding precedent and time to do so evinces at least grossly negligent conduct.  And when in viewed in tandem with *Garcia* and *Bertini*, such failure

is more than simple isolated instance of negligence but rather a one of an a nascent "recurring or systemic negligence." *Herring*, 555 U.S. at 144.

What is more, not only was the Cellphone Warrant deficient for a lack of indicia of probable cause, but its drafting also presents evidence that the issuing magistrate was perhaps misled by certain phrasing used in the warrant regarding how a confirmatory witness (the Tenant) purportedly identified Santos and the in what context s/he was identifying him, raising questions under the first *Leon* scenario.  *See infra* Part C.2.  While on the evidence before it the Court cannot determine whether the level of culpability to such drafting rose to the point of being "knowingly" misleading, it was nonetheless conceded by the Government the language "should have been much more descriptive."  OA Tr. 38:1-2; *see id.* 21:23-33:19

The upshot is to prevent the "ero[sion of] Fourth Amendment protections," *Carpenter*, 585 U.S. at 320, and to police against judicial mission creep of federal courts listing from acting as neutral arbiters to becoming a "rubber stamp for the police," warrants must sufficiently state particularized factual bases connecting a cellphone to criminal conduct.  *Clark*, 638 F.3d at 100. Warrants cannot be authorized on the basis of self-serving and conclusory observations put forth on the mantle of "training and experience" even though such hunches may later turn out to be correct.  While this may be a "bitter pill," it is "necessary" to swallow.  *Davis*, 564 U.S. at 237.  In this case, it is incumbent to address the issue, as it will only grow with the application of more such cellphone warrants.  Accordingly, the contents of Santos' cellphone, and any fruits thereof, must be suppressed.

## C.  A *Franks* Hearing is Not Warranted

Santos also moves for a *Franks* hearing based on alleged material misrepresentations and/or omissions in the Cellphone Warrant affidavit.  Santos Mot. at 16-20.  In *Franks v. Delaware*, the Supreme Court held that although warrant affidavits are presumptively valid, a

defendant may challenge the truthfulness of facts in the affidavit by seeking an evidentiary hearing. 438 U.S. 154, 155-56, 171. "[T]he burden to obtain such a hearing is a heavy one, and such hearings are exceedingly rare." *United States v. Yu,* No. 22-CR-208 (CBA), 2023 WL 4687970, at *13 (E.D.N.Y. July 21, 2023). A hearing is warranted, however, where a defendant supplies an offer of proof[15] that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *Garlick,* 2023 WL 2575664, at *7.

"To determine whether misstatements are material, a court must set aside the falsehoods in the application and determine whether the untainted portions of the application suffice to support a probable cause or necessity finding." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (cleaned up). "If the untainted portions of the application are sufficient to support the probable cause or necessity findings, then the misstatements are not 'material' and suppression is not required." *Id.* Santos claims three material misstatements or omissions are present in the warrants. *See* Santos Mot. at 18-20. For the following reasons, Santos has not made a sufficient evidentiary proffer as to any of the purported omissions or representations to require a *Franks* hearing, and as such the request is denied.

### 1. Omission of Mail Carrier-2's Certainty in Identifying Santos in the Photo Array

Santos argues that most "glaring" omission from the warrants is that Inspector Vernon failed to include the information that "Mail Carrier-2 was only 7/10 or 70% sure that Mr. Santos was the perpetrator" of the October Robbery. *See* Santos Reply at 9-10; Premises Warrant ¶ 21,

---

[15] Allegations attacking a warrant "must be accompanied by an offer of proof" and "be accompanied by a statement of supporting reasons." *Franks*, 438 U.S. at 171. Generally, this means the provision of "[a]ffidavits or sworn or otherwise reliable statements of witnesses" and not simply conclusory allegations made by the defendant. *Id.* While Santos has not offered sworn statements, they are not strictly required, and the Court considers his arguments because Santos' papers challenge specific portions of the affidavits, provide statements of reasons, and are driven by "more than a mere desire to cross-examine." *Id.*

Cellphone Warrant ¶ 21.  Santos contends that this omission is material because Mail Carrier-2 was the only eyewitness to a robbery who saw Santos' face uncovered; thus, omitting to Judge Bloom the fact that Mail Carrier-2 was only 70% sure in identifying Santos after viewing the Photo Array twice warrants a *Franks* hearing.  Santos Reply at 10.[16]

The Second Circuit has opined that "[a]lthough omissions are governed by the same rules as misstatements, the literal *Franks* approach does not seem adequate because, by their nature, omissions cannot be deleted; therefore a better approach would be to insert the omitted truths revealed at the suppression hearing."  *Rajaratnam*, 719 F.3d at 146 (cleaned up).  Here, adding in the fact that Mail Carrier-2's identification of Santos was made at a 70 percent level of certainty does not materially alter the probable cause determination made by Judge Bloom.  To the contrary, this 70 percent identification, made after viewing the array twice, equally *supports* the inference that Santos indeed robbed Mail Carrier-2.  *See Rajaratnam*, 719 F.3d at 156 (A finding of "reckless disregard for the truth" in the *Franks* context is "more inappropriate where the information omitted would only have further supported the government's position.").  It would be a different case entirely if Inspector Vernon omitted the fact that Mail Carrier-2's confidence level upon viewing the Photo Array was, in fact, entirely doubtful in contravention to his assertion that she "identified Santos as the person who robbed her."  Premises Warrant ¶ 21.  As materiality has not been sufficed, the Court need not examine the intent element as to the omission.

---

[16] In a discovery letter dated December 12, 2023, ECF 13, Santos requested the following *Brady* information: "If any witness has failed to identify Mr. Santos after any identification procedure, please identify the witness and indicate the date and circumstances of the identification procedure. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 115 S. Ct. 1555 (1995)." Letter dated December 12, 2023 ¶ 19.  The letter also requested that the Government "identify the witness and indicate the date the identification occurred, and the degree of certainty expressed by the witness."  *Id.*  Subsequently, in his reply and at oral argument, Santos contends that he was "provided *Brady* and *Giglio* information for the first time by confirming that Mail Carrier-2 was only 7/10 or 70% sure that Mr. Santos was the perpetrator."  Santos Reply at 10 (citing Gov't. Opp. at 7).

**2. Tenant's Purported Identification of "Santos" in the September Surveillance Stills**

Santos also contends that Inspector Vernon made a material misrepresentation by claiming that the Tenant "was shown surveillance video stills from the [September] Robbery, including the image above at Figure 1[17], and s/he identified the individual pictured as SANTOS."  Cellphone Warrant ¶ 22.  Santos contends this averment is misleading because the photo referenced in the warrant that was shown to the Tenant was only of a person talking on the phone, not actually of the robbery itself.  Santos Reply at 12.  Accordingly, Santos urges that this misrepresentation is grave and material because it "gives the impression that [the Tenant] identified Mr. Santos as the perpetrator of the September 30 robbery."  *Id*.

The Court finds the affidavit misleading in several ways as it regards the Tenant's purported identification of Santos.  First, as noted above, *supra* Part A.2, the only actual "identification" confirmed by the Tenant was that the person s/he saw in the photos presented to her/him resided at the Sutter Ave Residence, not that the Tenant had been an eyewitness to the robbery or even knew Santos by name.  *See* Premises Warrant ¶¶ 22-23.  However, as worded in the Cellphone Warrant, this statement may have given the impression to the magistrate judge that the Tenant specifically uttered Santos' name in identifying him.  The Government walked back its position at oral argument and conceded this was not the case and that the Tenant did not know Santos' name.  *See* OA Tr. 19:12- 22:13.

Second, the use of the language "surveillance video stills from the First Robbery" in Paragraph 22 of the Cellphone Warrant ("Paragraph 22") is also misleading.  The Cellphone Warrant at Paragraph 10 states:

> Neighborhood security video footage from the day of the First Robbery shows an individual whose appearance is consistent with Mail Carrier-1's description of the perpetrator . . . The footage shows him on his phone at approximately 1:00 p.m.—

---

[17] These are the September Surveillance Stills.

less than two hours before the First Robbery. This individual is wearing what appear to be the same sweatshirt, pants and shoes as described by Mail Carrier-1 and shown in the video, described below, of the First Robbery.

Cellphone Warrant ¶ 10 ("Paragraph 10").

At Figure 1, immediately below Paragraph 10, is a still of a man purported to be Santos on a phone, the same as those in the September Surveillance Stills exhibit.  *Id.*

Then, at Paragraph 22, the affiant avers that the Tenant "was shown surveillance video stills *from the First Robbery*, including the image above at Figure 1, and s/he identified the individual pictured as SANTOS."  *Id.* ¶ 22 (emphasis added).  As noted by the Court at oral argument, this change of words by the affiant is misleading.  Inspector Vernon knew how to employ words of different import earlier in the warrant, but he swore later that Tenant had reviewed actual video of the "First Robbery," when indeed the only actual photographic evidence s/he had seen was "neighborhood security video footage" of a Black man walking on the street talking on a cellphone taken two hours before the September Robbery.  *Id.* ¶¶ 10, 22.

Third, the Government's arguments as to why the warrant was not misleading are not availing.  At oral argument, the Government took the position that the Cellphone Warrant was not misleading because Paragraph 22 can be read as "referenc[ing] all of the photos that were shown to [the Tenant] from the day of the first robbery."  OA Tr. 24:15-17.  However, this is not corroborated anywhere within either Warrant.  Further, the Government also averred that the "surveillance video of the first robbery" that was shown to the tenant actually came from the photographic still contained in the USPIS Wanted Poster that was shown to the Tenant at his second interview on October 15.  OA Tr. 24:23-26:15.  The Government contends that such statements were not misleading because in fact the Tenant identified the person on the right of the USPIS Wanted Poster—"Santos" talking on the phone—which was next to the photo of an

unknown person holding up Mail Carrier 1. *See* USPIS Wanted Poster; OA Tr. 26:15 (the Tenant identified Santos "from both pictures" in the USPIS Wanted Poster). In sum, the Court finds the Cellphone Warrant misleading because it states that the Tenant was shown "stills from the First Robbery," yet the only actual stills shown to the Tenant were from earlier in the day and do not picture any robbery at all but rather a Black man matching Santos' description on a cellphone. *See* OA Tr. 31:9-33-19.

However, the question left for the Court is whether these "alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding" of the Cellphone Warrant. *Garlick,* 2023 WL 2575664, at \*7. That is, notwithstanding the Court's conclusion to the contrary above, were the allegations in Paragraph 22 so material to the magistrate judge's determination of probable cause that without them, the Cellphone Warrant would have been devoid of probable case. It is indeed just the Cellphone Warrant that is challenged by Santos. *See* Santos Mot. at Notice of Motion ¶ 1; Santos Mot. at 16. And while perhaps these misleading allegations would have had more weight in challenging probable cause as to the issue of whether Santos was the person who committed the robberies, a grand jury has already indicted him for both robberies. The Court concludes that the allegations in Paragraph 2 of the Cellphone Warrant are not material because they do not pertain to cellphone ownership, use of a cellphone at the time of the robbery, or use of a cellphone in connection with or to facilitate a robbery. *See Bertini*, 2023 WL 8258334, at \*7.

However, this evidence *is* pertinent to the good faith inquiry, as Inspector Vernon's knowing change of language within the Cellphone Warrant evinces a deliberate intent to the mislead the magistrate judge into believing that the evidence tying Santos to the crimes in general was stronger than it was.

### 3. Alleged Misrepresentation as to the Metal Pipes Found at the Sutter Ave Residence

In the Cellphone Warrant, Inspector Vernon averred that "[d]uring the course of that search" of the Sutter Ave Residence, law enforcement agents "located metal pipes matching the description and surveillance footage of the silver object Santos used in the First Robbery." Cellphone Warrant ¶ 23. Santos alleges this contains two misrepresentations as to the metal objects. *See* Santos Reply at 11 (citing Gov't Opp at 2, 14; Ex. 3 to Gov't Opp.). First, that there is a misrepresentation because newly disclosed evidentiary photos show that the "metal pipes" may have just been parts of a disassembled Swiffer mop. *See id.* Second, the averment that the pipes were found in "the areas of the [Sutter Ave Residence] used by Santos," Cellphone Warrant ¶ 23, is false because the metal objects were found not inside the Sutter Ave Residence as sworn, but rather "scattered outside of the back entrance to the defendant's sister's apartment and in a bag." Gov't Opp. at 2.

Santos claims that these alleged misrepresentations are material because they are the only piece of physical "evidence in any way connecting Mr. Santos to either robbery." OA Tr. 18:2-18. Even accepting that there are misrepresentations and falsities, there is no reasonable argument as to how these misrepresentations and falsities about the metal objects' place of recovery were necessary or material to a finding as to probable cause to search Santos' cellphone, much less made with the requisite intent.

### D. Custodial Statements Made by Santos

Santos also seeks to suppress certain statements made after he was arrested and questioned on October 20, 2023. Santos Mot. at 3, 6 (citing *Miranda v. Arizona,* 384 U.S. 436, 439 (1966)).

Santos argues that he "did not knowingly or voluntarily waive his *Miranda* rights."[18]  *Id.* at 3, 9; *see Berghuis v. Thompkins,* 560 U.S. 370, 382  (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement").

A *Miranda* "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and must be 'knowing[ ]' in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *United States v. O'Brien,* 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis*, 560 U.S. at 382-83).   There is "no per se rule that bars oral or implicit waivers" by a defendant of his *Miranda* rights.  *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

"The waiver need not have been express; courts can infer a waiver of *Miranda* rights from the actions and words of the person interrogated."  *Id.*  (quoting *Berghuis*, 560 U.S. at 387) (quotation marks omitted).  "The prosecution need prove waiver only 'by a preponderance of the evidence,' and it may be inferred 'from all the circumstances.'"  *Id.* (quoting Berghuis, 560 U.S. at 384).  "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police."  *Id.* (quoting same).

---

[18] There is no dispute that Santos was in custody and subject to interrogation, the other required elements of a *Miranda* claim. *See Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) (*Miranda* "applies only in the context of custodial interrogation.").

According to the facts proffered by the parties,[19] on October 20, 2023, after Mr. Santos was arrested, he was brought to a debriefing room and questioned by NYPD officers. Inspector Vernon then read Santos his *Miranda* rights from a small card he referred to as his "agency form." Santos Mot. at 6; *see also* Gov't Opp. at 23. Inspector Vernon "did not show the card to Mr. Santos or allow Mr. Santos to read the *Miranda* warnings for himself." Santos Mot. at 6. After Inspector Vernon read Santos the *Miranda* warnings, the following exchange occurred:

> Officer: Do you understand your rights sir?
>
> Santos: I do.
>
> Officer: Now that I have read those to you verbatim, I just need to ask you some questions, right. I just need to go over some stuff [unintelligible].

*Id; accord* Gov't Opp. at 23.

Santos contends that this exchange was "deceptive" because "Santos was never asked if he wished to waive his rights or speak with the officers." Santos Mot. at 10. "Rather, the officers asked Mr. Santos only if he understood his rights and then immediately told him that they 'needed' to ask him questions and 'needed' to go over things." *Id.* Thus, claims Santos, there was no knowing or voluntary waiver because "officers directed him to speak with them and presented the interrogation as a requirement that Mr. Santos had no choice but to comply with." *Id.* Santos left his *Miranda* argument untouched in his reply.

"Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *United States v. Ashburn*, 76 F. Supp. 3d 401, 439 (E.D.N.Y. 2014) (citing

---

[19] Both Santos and the Government rely on video of the questioning disclosed by the Government in discovery. The Court is not in receipt of the video itself, but both parties agree this relevant portion of the video is accurate; therefore the Court takes these facts as undisputed for the purposes of this motion. *See* Santos Mot. at 6; Gov't Opp at 22-23.

*United States v. Plugh*, 648 F.3d 118, 127 (2d Cir.2011)); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010).   The Court finds that no *Miranda* violation lies here because Santos received a reading of his rights, stated affirmatively that he understood them, and then continued to speak with law enforcement.   "Thus, the court presumes that an individual who, 'with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.'"   *Ashburn*, 76 F. Supp. 3d at 439 (quoting *Berghuis*, 560 U.S. at 385).

Further such conduct has routinely been found to satisfy the waiver of a suspect's *Miranda* rights.   *See, e.g.*, *id.* at 441 (finding waiver where suspect refused to sign *Miranda* forms and "explicitly stated he understood the [*Miranda*] warnings, admitted to having received them on a previous occasion" and continued to talk to officers and at not point "unambiguously invoke his right to remain silent"); *United States v. Brito*, 592 F. Supp. 2d 582, 587 (S.D.N.Y. 2008) ("Again, Mr. Brito's response is notable both for what it communicated and for what it did not communicate. Once again, Mr. Brito did not choose to remain silent or indicate that he wanted to exercise any of the rights of which he had just been informed. . . . . Brito's conduct until this point demonstrates that he was choosing not to exercise any of his *Miranda* rights but was willing to engage Detective Pina in a dialogue about the investigation"); *United States v. Dosanjh*, 08-CR-211, 2008 WL 5209991, at *5 (S.D.N.Y. Dec. 11, 2008) (finding implied waiver where the "[d]efendant understood her rights, but nevertheless responded to [the officer's] comments and questions"); *see also Kaba v. Miller*, No. 20-CV-4011 (DC), 2024 WL 991172, at *7 (E.D.N.Y. Mar. 7, 2024) (rejecting habeas petitioner's suppression arguments that "he was not read his Miranda warnings, nor given an explanation as to what he was doing when he signed the form waiving his Miranda

rights" and that "in the alternative, that even if his *Miranda* warnings were given and his statements were uncoerced, he did not fully understand these rights.").

Santos never told the agents he wished to remain silent or that he did not want to talk with them and. there is nothing to indicate that the Defendant was not properly read his *Miranda* rights or that he did not understand its warnings. *See O'Brien,* 926 F.3d at 74; *United States v. Wright*, No. 10-CR-504-S-1 (ADS) (ARL), 2012 WL 1132421, at *4 (E.D.N.Y. Apr. 2, 2012). Further, there is no evidence of "intimidation, coercion, or deception." *See United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014). Lastly, there is no evidence that anything impaired Santos' ability to understand the right he was waiving. *See O'Brien,* 926 F.3d at 74 ("[N]o one testified that [defendant] was somnolent or in a stupor or not fully conscious during his dealings with" law enforcement)*. On these limited facts, the Court concludes that, by a preponderance of the evidence, Santos knowingly and voluntarily waived his *Miranda* rights by continuing to speak with law enforcement after receiving and affirming his understanding of his Miranda rights. "A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Davis v. United States,* 512 U.S. 452, 460–61 (1994). Therefore, the Defendant's motion to suppress his post-arrest statements is denied. *See Wright*, 2012 WL 1132421, at *4 (denying motion to suppress in the same scenario).

**CONCLUSION**

For the reasons explained above, Santos' motion to suppress is **GRANTED in part** and

**DENIED in part**.  Specifically, the Court finds: (1) out-of-court identifications made by the three

individuals are admissible; (2) a *Franks* hearing is not warranted; (3) Santos' custodial statements

are admissible; and (4) Santos' cellphone contents, and any fruits thereof, are suppressed.

**SO ORDERED.**


                                                            /s/ Orelia E. Merchant
                                                            ORELIA E. MERCHANT
                                                            United States District Judge

Dated:          July 29, 2024
                Brooklyn, New York